NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FMC CORPORATION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> AMERICAN CYANAMID, et al, : <br> : <br> Defendants. : | **Hon. Dennis M. Cavanaugh** |
| UNITED STATES OF AMERICA : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> FMC CORPORATION, et al, : <br> : <br> Defendants. : | **OPINION** <br><br> Civ. No. 01-0476 (DMC) (JAD) |
| NEW JERSEY DEPARTMENT OF : <br> ENVIRONMENTAL PROTECTION and : <br> THE ADMINISTRATOR OF THE NEW : <br> JERSEY SPILL COMPENSATION : <br> FUND, : <br> : <br> Plaintiffs, : <br> : <br> v. : <br> : <br> HIGGINS DISPOSAL SERVICE, INC., et : <br> al., : <br> Defendants. : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Defendant FMC Corporation's ("FMC") motion for summary judgment pursuant Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs New Jersey Department of Environmental Protection ("NJDEP") and The Administrator of the New Jersey Spill Compensation Fund (together "the State") filed a Complaint seeking damages for natural resource injury stemming from contamination of groundwater on property located in Franklin Township, New Jersey. FMC's motion is limited solely to the issue of whether the State waived its right to pursue natural resource damages. No oral argument was heard pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, FMC's motion is **granted**.

## I. BACKGROUND[1]

The present motion stems from a lengthy litigation involving the contamination of groundwater at a site in Franklin Township, New Jersey ("the site"). Def.'s Br. 4. The site was added to the Federal Superfund National Priorities List in 1990. Def.'s Br. 4. FMC and the United States conducted a series of settlement negotiations with regard to remediation of the site beginning in 1997. Def.'s Br. 6. In 1998, pursuant to an Administrative Order on Consent, FMC agreed to perform a "removal action" to remove contaminated materials from the site at a cost to FMC of over $6 million. Def.'s Br. 6. In early 2001, FMC commenced an action to recover monies from responsible parties, which was followed by an action by the United States against FMC and others. Def.'s Br. 6. Soon after the government filed its action, settlement negotiations began between the respective parties. Def.'s Br. 6.

---

[1] The facts in the Background section have been taken from the parties' submissions.

Eager to determine the total extent of its exposure to damages, FMC contacted the New Jersey Attorney General's office in mid-2001, the State having indicated previously that it had some claims against FMC. Def.'s Br. 6; Halloran Decl. ¶ 4, ECF No. 290-3. The Attorney General's office forwarded FMC's inquiry to Barbara Dietz, the assessment coordinator for the NJDEP's Office of Natural Resource Restoration. Halloran Decl. ¶ 6. In response to the inquiry, Ms. Dietz prepared a memorandum dated October 12, 2001 (the "Dietz Memo"), in which she stated that NJDEP would not assess natural resource damages for the site because the groundwater plume did not extend off-site and because a proposal was being reviewed to reinject the treated water into the ground. Halloran Decl. ¶ 6. Dietz concluded that: "Based upon a review of the file and conversations with the EPA Remedial Project Manager and NJDEP's Site Manager, The Office of Natural Resource Restoration (ONRR) has determined that injuries to natural resources will not be assessed." Mack Decl. Ex. 1, ECF No. 289-2. The information in the Dietz Memo was communicated to FMC's counsel via a telephone conversation in late 2002; FMC was not provided with a copy of the memo. Halloran Decl. ¶ 6.

As settlement negotiations continued between FMC and the United States, effectively staying the litigation, FMC renewed is request for cost itemization and amounts from the State and also requested a copy of the Dietz Memo. Def.'s Br. 7. In a letter dated January 31, 2003 from Deputy Attorney General Halloran to FMC's counsel (the "Halloran letter"), attaching the Dietz Memo, Ms. Halloran wrote:

> Enclosed please find a copy of our latest cost run for the [site]. As we discussed over the telephone today, we do plan to make a demand for these costs, as we do for the Higgins Farm costs. Also attached is a copy of a memorandum to me from DEP's Office of Natural Resource Restoration explaining why no natural resource damages are being assessed at this site.

Mack Decl. Ex. 2., ECF No. 289-2. FMC advised the other parties to the action of the contents of the Dietz Memo in April 2003. Def.'s Br. 8.

NJDEP adopted a policy in the late 1990s of excluding on-site ground water contamination from the assessment of natural resource damages in instances where there was no off-site ground water contamination and where no other natural resources were impacted by the discharge of hazardous substances. Halloran Decl. ¶ 3. This policy remained in effect when the Dietz Memo was written and served as the basis for the determination that FMC would not be responsible for natural resource damages. Following an administration change in 2002, however, NJDEP altered its policy on the assessment of natural resource damages. Halloran Decl. ¶ 9-11. This policy change was memorialized in Policy Directive 2003-07, which stated: "For parties that initiate settlement discussions with DEP, the Department will use the settlement valuation formula developed and applied by the Office of Natural Resource Restoration in past years. In the application of the formula, which shall only be used as a settlement tool, on-site groundwater will not be excluded . . . ." Halloran Decl. Ex. 2, ECF No. 290-3. Deputy Attorney General Halloran learned in September 2004 that the DEP had changed its policy with regard to on-site groundwater contamination and that NJDEP would seek natural resource damages for contamination at the site. Halloran Dec. ¶ 12.

In 2006, NJDEP filed suit against FMC and others, seeking precisely the kind of damages that the Dietz Memo and the Halloran Letter had represented the State would not pursue. Def.'s Br. 8. There is no indication that NJDEP notified FMC of its intention to seek natural resource damages prior to filing suit.

## II. STANDARD OF REVIEW

"A court reviewing a summary judgment motion must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." Gaston v. U.S. Postal Serv., 319 Fed. Appx. 155, 157 (3d Cir. 2009). However, "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Generally, "[a] party against whom relief is sought may move, with or without supporting affidavits, for summary judgment on all or part of the claim" at any time "until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b), (c). "[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Cartrett, 477 U.S. 317, 325 (1986). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. (citing Fed. R. Civ. P. 56(c)).

> When a motion for summary judgment is properly made and supported, [by contrast,] an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2). If "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Indeed,

"unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." See Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56(e) permits "a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Id. (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)). "It is clear enough that unsworn statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are the unsupported allegations of the pleadings." Schoch, 912 F.2d at 657.

### III. DISCUSSION

FMC argues that summary judgment should be granted on the State's claims for natural resource damages because the Dietz Memo and the Halloran Letter amounted to waiver of those damages. Def.'s Br. 1. NJDEP cross-moves to strike the affirmative defense of waiver and argues that its representations to FMC did not amount to a waiver of natural resource damages. It further argues that even if a waiver had been made, "the doctrine of waiver should not be applied under these circumstances [because] a government agency may change policies for the benefit for the public without creating rights in parties who claim to have relied on the old policy." Pl.'s Br. 2. The facts surrounding the issuance of the Dietz Memo and the Halloran Letter are not disputed by the parties, neither is the text of the documents. Pl.'s Br. 6 ("Plaintiff DEP agrees that there are no material issues of fact in dispute regarding the issue of waiver as raised in FMC's motion.") Therefore, all that remains is for this Court to determine whether the elements of the waiver doctrine have been satisfied and, whether, even if NJDEP did previously waive its right to damages, it may still pursue them in this litigation because of an intervening policy change.

Under New Jersey law, waiver "'involves the intentional relinquishment of a known right.'" Metex Mfg. Corp. v. Manson, No. 05-2948 (HAA), 2008 U.S. Dist. LEXIS 25107, at *17 (D.N.J. Mar. 28, 2008) (quoting Shebar v. Sanyo Bus. Sys. Corp., 544 A.2d 377, 384 (N.J. Sup. Ct. 1988)).  Thus, "it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." Id.  Waiver "must be evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." Scibek v. Longette, 770 A.2d 1242, 1249 (N.J. Super. Ct. App. Div. 2001).

NJDEP does not dispute that the representations in the Dietz Memo were voluntary.  Nor does it contest the fact that NJDEP had the right to seek natural resource damages at the time that it issued the Memo and the subsequent Letter to FMC.  Instead, FMC argues that "[i]t is highly unlikely that in issuing the Dietz memorandum, ONRR would have intended to permanently affix the agency's position on seeking [natural resource damages] . . . if the agency, under a new commissioner, chose to alter that policy later." Pl.'s Br. 7.  While "[q]uestions of waiver . . . are usually questions of intent, which are factual determinations that should not be made on a motion for summary judgment," Shebar, 544 A.2d at 384, here, there is no real question that when NJDEP issued the Dietz Memo, it had no intention of pursuing natural resource damages.  The language of the Memo and accompanying Halloran Letter could not have been more explicit as to this point.  Furthermore, the text of the letter was not in any way qualified – it did not state that the State's determinations were subject to change pending policy shifts within the NJDEP, nor did the Memo state that its determinations were founded upon a current NJDEP policy of not pursuing

natural resource damages for on-site groundwater contamination.[2] Finally, the Halloran Letter was issued in 2003, <u>after</u> Governor McGreevey came into office and a new NJDEP Commissioner was appointed. Halloran Decl. ¶ 9. Therefore there is no reason to believe that the administration change in 2002 in and of itself would have undermined the intent expressed in the Dietz Memo and the Halloran Letter to not seek natural resource damages. Accordingly, NJDEP's representations in writing in 2003 that it would not assess natural resource damages on the site amounted to an express waiver of the State's right to seek said damages.

Though "the application of waiver or estoppel principles to government actions is to be most strictly limited," <u>Buonviaggio v. Hillsborough Twp. Comm.</u>, 583 A.2d 739, 744 (N.J. Super. Ct. 1991), NJDEP's argument that a government agency may change its position after waiving its right to damages is unavailing. The State has failed to cite any cases where a government agency has expressly waived a right, in writing, and was then permitted to renege on that representation. NJDEP was free to change its policies at any time, to temper its representations to FMC or to qualify them such that FMC would have been aware that NJDEP's decision not to pursue natural resource damages remained contingent upon agency policy.[3] However, what the State cannot do is expressly waive its right to access natural resource damages twice over the span of two years and then about face years later. To allow such a result would serve to completely alter the calculus of the litigation and undermine settlement negotiations that parties engage in with the

---

[2] The Memo offered at least two reasons for not pursuing the damages: "ONRR will not assess ground water injuries since ground water would be re-injected on-site and since the ground water plume does not extend beyond the Sites boundaries." Mack Decl. Ex. 2.

[3] Deputy Attorney General Halloran did just that with regard to a different issue when she specifically noted that: "Provision of this document does NOT constitute a waiver of any discovery privilege or protective doctrine for this Site or for Higgins Farm." Mack Decl. Ex. 2.

State.

## IV.  CONCLUSION

For the reasons stated, Defendant's motion seeking summary judgment is **granted** and Plaintiff's cross-motion to strike the affirmative defense of waiver is **denied**.

                                             S/ Dennis M. Cavanaugh
                                          Dennis M. Cavanaugh, U.S.D.J.

Date:        September   29  , 2010
Orig.:        Clerk
cc:          All Counsel of Record
              Hon. Joseph A. Dickson, U.S.M.J.
              File